631 So.2d 536 (1994)
STATE of Louisiana,
v.
James M. MONDS.
No. 91-KA-0589.
Court of Appeal of Louisiana, Fourth Circuit.
January 14, 1994.
Rehearing Denied February 10, 1994.
*537 James M. Bullers, Dist. Atty., Robert Randall Smith, Asst. Dist. Atty., Benton, for appellee.
John C. Milkovich, Carola Milkovich, Shreveport, for appellant.
Before LOBRANO, ARMSTRONG and WALTZER, JJ.
LOBRANO, Judge.
In the early morning hours of July 6, 1985 the brutally murdered body of Vicky Thomas was found in the parking lot of Parkway High School in Bossier City.[1] Defendant, James Monds, was subsequently arrested, tried and convicted of first degree murder. The State's answer to Monds' bill of particulars states that the homicide was committed while defendant was engaged in the perpetration or attempted perpetration of aggravated rape, armed robbery or simple robbery.
*538 The trial of this matter began January 27th and concluded February 11, 1986. Defendant was sentenced to life imprisonment on February 12, 1986. Defendant filed several post trial motions, including motions to recuse the district judge who was to preside at the motion for new trial as well as the district attorney. Both motions were denied.[2] The motion for new trial lasted sixtyfive days over a period of four months and was denied. This appeal followed.
FACTS LEADING TO MONDS' ARREST:[3]
At approximately 6:15 a.m. on July 6, 1985, construction workers, building a new football stadium for Parkway High School in Bossier City, Louisiana, discovered the body of Vicky Thomas in the front parking lot of the school. Except for black socks, she was nude from the waist down. Above the waist she was clad in a large long sleeve blue shirt with vertical stripes. Her hands were bound behind her back with three inch surgical tape. Her mouth was also taped with three inch surgical tape which encircled her entire head.
Thomas suffered a total of 19 stab and slashing wounds. One wound was located all the way across her forehead through the skin to the skull. The fatal wound cut through all major parts of the neck and is commonly referred to as "slitting one's throat".
Two areas of blood were found at the scene. The first pool of blood plus bruises on Thomas' body indicate she was thrown to the ground and stabbed several times. From there she crawled or struggled forward to the second pool of blood where her throat was cut and she fell over onto her left side.
Earlier that morning, Officers Pete Smith and Jim Richmond were on patrol travelling south on U.S. Highway 71. They observed a brown with white top Ford Bronco also travelling south. Officer Richmond recalled a bulletin issued earlier that evening concerning a stolen vehicle similar in description.[4] Richmond radioed headquarters for a more precise description of the stolen vehicle. Officer Kenneth Hamm, who had originally issued the stolen vehicle report, was on his dinner break at a local restaurant when he overheard Richmond's request. Hamm interrupted Richmond's radio transmission and gave him the license number and description of the stolen vehicle. Richmond checked that information against the Ford Bronco and concluded it was not the stolen vehicle. However, Smith and Richmond continued to follow the Bronco suspecting a possible DWI. Subsequently, the driver of the Bronco pulled into the Teddy Bear Restaurant parking lot. A girl was seen standing near the front door on the passenger side. The officers then proceeded to respond to another call and then went on their dinner break. Later that morning, Officer Smith, upon hearing of the murder, proceeded to the crime scene. Upon viewing Thomas' body he recalled the girl he observed near the Bronco was wearing the same shirt as the victim.
Gregory Dale, a local resident, heard of the murder and contacted the police. Dale told the police that he left his girlfriend's house at approximately 3:00 a.m. to go home. He drove past Parkway High School at about 3:15 a.m. As he passed the school he noticed either a Blazer or Bronco, brown with white top, parked in the vicinity of where Thomas' body was later found.
The information from Dale, Smith and Richmond led police to look for a Ford Bronco, four wheel drive type vehicle, brown with white top. As a result of their search, on July 19, 1985, thirteen days after the murder, Officer Glenn Sproles located James Monds' vehicle at the Barksdale Air Force Base Hospital parking lot. The vehicle was a Ford Bronco, brown with white top. Police also learned that defendant worked as a surgical technician. As a result of certain evidence obtained from the vehicle, from defendant's home, and from the autopsy of the victim, *539 Monds was arrested and convicted for the first degree murder of Thomas.
Defendant appeals his conviction and sentence asserting thirty seven trial errors. He also appeals the trial court's denial of his motion for new trial. One of his assignments of error is insufficiency of evidence. It is a well settled principle that a review for sufficiency of evidence is necessary even though there may be other grounds for a new trial. State v. Hearold, 603 So.2d 731 (La.1992). "When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors the reviewing court should first determine the sufficiency of the evidence." Id. at 734.
The Due Process Clause of the Fourteenth Amendment protects persons accused of a crime against conviction unless the State proves every element of the offense beyond a reasonable doubt. In re Winship, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). This constitutional protection forms the basis of a reviewing court's sufficiency of evidence determination. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). In addition "the constitution and laws of Louisiana afford bases for an equally rigorous state standard of review." State v. Mussall, 523 So.2d 1305 (La.1988) at 1309.
In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Green, 588 So.2d 757 (La.App. 4th Cir.1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, supra. The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted. The fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall; Green, supra. "[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." State v. Smith, 600 So.2d 1319 (La. 1992) at 1324.
In addition, when circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Shapiro, 431 So.2d 372 (La.1982). The elements must be proven such that every reasonable hypothesis of innocence is excluded. La.R.S. 15:438. This is not a separate test from Jackson v. Virginia, supra, but rather is an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt. State v. Wright, 445 So.2d 1198 (La.1984). All evidence, direct and circumstantial,[5] must meet the Jackson reasonable doubt standard. State v. Jacobs, 504 So.2d 817 (La.1987). The exclusion of every reasonable hypothesis of innocence is a component of the more comprehensive reasonable doubt standard. State v. Wright, 445 So.2d 1198 (La.1984). Stated another way, where the evidence is purely circumstantial, if it does not exclude every reasonable hypothesis of innocence, a rational juror cannot find defendant guilty beyond a reasonable doubt without violating constitutional due process safeguards.
In a case factually similar to the instant case, the Louisiana Supreme Court found insufficient evidence to sustain defendant's *540 second degree murder conviction where the state's case was based solely on circumstantial evidence. The circumstantial evidence consisted of physical evidence which did not exclude the defendant.[6] He was the last one with the necessary physical characteristics seen alive with the victim; it was possible for him to have committed the crime since he could not confirm the time of his arrival at his home; and the victim's car was abandoned two-tenths of a mile from his house. In reversing defendant's conviction the Court noted that since no direct evidence of any element of the crime was presented (except for the fact that the crime was committed), "the circumstantial evidence must be analyzed to determine whether it excludes every reasonable hypothesis of innocence." State v. Williams, 423 So.2d 1048 (La.1982) at 1052. The court concluded that although the evidence did not exclude the defendant, it was insufficient to exclude other reasonable hypotheses.
With these legal principles in mind, we analyze in detail the evidence which forms the basis of Monds' conviction.
SIGHTINGS BY OFFICERS RICHMOND AND SMITH:
Officer James Richmond was a reserve Bossier City Police Officer on July 5th and 6th 1985. He was assigned the 10:00 p.m. to 5:00 a.m. shift with Officer Smith, a regular Bossier City policeman.
On the night of July 5th, he was riding in the passenger side of the police unit with Officer Smith driving. As they were proceeding south on Barksdale Blvd. (Hwy. 71) he observed a "jacked up" brown and white Bronco pass on the right of his vehicle. He described the vehicle as being dirty and with balloon tires. He saw brown lettering that said "FORD". Having recalled a bulletin issued earlier that evening about a stolen vehicle, Richmond radioed headquarters for a description.
At that time Officer Kenneth Hamm, who had investigated the stolen vehicle complaint earlier that evening, heard Richmond's transmission on his radio. He interrupted the transmission and gave Richmond the description. According to Hamm, he was on his evening meal break when he overheard Richmond's transmission. The dispatcher's log shows he took his break at 2:55 a.m. He testified he spoke to Richmond approximately ten minutes later.
The stolen vehicle description relayed to Richmond did not match the Bronco he had observed. However, they continued following the vehicle as Smith suspected a possible DWI violation.
The Bronco eventually pulled into the Teddy Bear Restaurant parking lot, turned and parked facing toward Barksdale. Smith made a U-turn, proceeded north on Barksdale, then made another U-turn with the intent to stop the Bronco if it pulled out of the parking lot.
Richmond testified that while the Bronco was in the parking lot, he observed a white female standing on the passenger side with her hand on the door as if she was about to get in. He described her as having dirty blond hair and wearing a vertical striped blouse and black pants.
Smith testified that he observed a white female with dirty blond hair wearing a blue shirt with black vertical stripes and tight black pants walk from the rear of the vehicle (which was facing the restaurant) to the front passenger side.
Neither officer saw the female actually enter the Bronco. Neither officer remembered the license plate number of the Bronco. Smith testified that he remembered the numbers beginning with "T 116 ..." or something similar. Richmond testified he remembered the numbers beginning with a "T" then a "1".[7] He said it could have been T146.
*541 Neither officer noticed if the Bronco had a spare tire on the back, nor could they recall any other accessories.[8] Neither could identify the driver nor could they say if anyone else was in the vehicle. Both testified that the sighting took place around 3:00 a.m. the morning of July 6th. However, neither officer had independent recollection of the specific time. Instead they relied on the time established by Officer Hamm's transmission. Hamm's recollection was based on the time of his meal break which the dispatcher's log reflects as 2:55 a.m.
After responding to an incident at the Barksdale 7-11, Richmond and Smith went on their meal break at 3:35 a.m. at the Country Kitchen.

MONDS' ARREST:
Officer James Viola was dispatched to the crime scene shortly after the victim was discovered. The crime scene was secured.
Officer Huddleston's job was to process the crime scene. Several items, including two beer cans, a Marlboro and Merit cigarette package, a match box and photographs of tire tracks were secured. None of the seized items had identifiable fingerprints.
On the night of July 6th, Investigator Glenn Sproles interviewed Officers Smith and Richmond at which time he learned the victim's clothing matched that of the girl they had seen earlier near the passenger door of the Bronco.[9] At that point Sproles concentrated his efforts on locating the Bronco.
As a result of investigative work by Sproles and others, on July 19th Sproles located Monds' vehicle in the parking lot at Barksdale Air Force Base.[10] He testified it looked as if there were blood spatters on the right rear panel, near the wheel well. Sproles then contacted Huddleston to meet him there.
Upon arrival at the base Monds was located, transported to the police station and interviewed. The Bronco was towed to the police garage and searched with Monds' permission. Sproles testified that Monds was cooperative.
As a result of the search, a black first aid kit containing two rolls of surgical tape were seized. One roll was two inch tape, the other three inch. They were sent to the FBI lab for analysis. Huddleston dusted the exterior and interior for prints with no success. Some twenty-four or twenty-five cards, each containing one or more prints, were lifted but none matched the victim. In addition, the Northwest Louisiana Crime Lab examined the Bronco, the results of which are discussed in detail later in this opinion.
Monds gave Sproles a statement on the 19th wherein he stated that on the night of July 5th he went to a party on Northside Drive with some friends. He stated he left the party around midnight with Clarence Wilborn and someone named Darrell to go mud riding around Shreveport. During the course of the evening they had a flat and went to a service station to have it fixed. They also stopped to speak to a friend in the parking lot of Toys `R Us. Monds stated he returned to the party and dropped off Wilborn and Darrell and then went home. He initially stated he arrived home around 4:30 a.m., but then stated it was somewhere around 3:00 a.m. because he dropped off Wilborn and Darrell about 2:45 a.m. He drove down Barksdale Blvd. to get home. Monds told Sproles that the surgical tape in the first aid kit was for a paramedic course *542 he was taking. He is a surgical technician at Barksdale Air Force Base.
After giving his statement Sproles proceeded with Monds to his trailer where Monds showed him the camouflaged pants and tennis shoes he wore the night of the party. Sproles did not take the pants as he saw no visible signs of blood and thought they had been washed. The shoes were taken because they had red spots that looked like blood.
On July 23rd Sproles interviewed Monds at the Barksdale Air Force Base. Monds was cooperative but was concerned about getting his vehicle back. On July 25th a search warrant was executed at Monds' home. His camouflage pants, a camouflage hat, a pair of black boots and 2 hunting knives in sheathes were seized and given to the crime lab.
On July 30th Monds was arrested for the murder of Vicky Thomas.

AUTOPSY EVIDENCE:
Dr. George McCormick was the forensic pathologist who performed the autopsy on Vicky Thomas. He testified as follows:
Vicky Thomas was clad in a blouse or shirt, a black bra and socks. She was covered with blood mostly on the face, chest and legs. She had a large number of stabbing and cutting wounds as well as contusions on several parts of her body. Most stab wounds were in the neck area. Tape bound her hands behind her back and across her mouth. Death was from loss of blood mainly from the large cut on her neck.
McCormick took vaginal and rectal swabs and washings and sent them to the crime lab. Although the victim's rectum was dilated there was no evidence of trauma such as reddening or tearing and no hemorrhage. His lab analysis did not show evidence of recent sexual intercourse. He found no seminal acid phosphatase but did find vaginal acid phosphatase in the amount of 20.2 international units. However, to indicate recent intercourse 100 units or more are needed.
McCormick also found a black hair, not tightly coiled, on the victim's cervix. It was 3½ to 4 inches into the vagina. He stated it was very unusual to find a foreign pubic hair in the vagina of a victim, and that he has found them in less than 10% of all murderrape cases he has examined. He could not say if it was a pubic hair.
McCormick concluded that the victim's wrists were taped before her mouth because the tape on her head was neatly layered while on her wrists it was twisted and bunched indicating a struggle. Based on the crime scene photographs he opined that the victim was forcibly thrown to the gravel surface several times; that she was stabbed in the back of the neck and back while near the first pool of blood; somehow she was moved or she moved to the area of the second pool of blood where she sustained the cut to her throat causing immediate death.
McCormick sent to the crime lab the vaginal and rectal swabs and washings; the cervix hair; an eyebrow, head and pubic hair of the victim and the tape used to bind the victim.

CRIME LAB RESULTS:
Pat Wojtkiewicz and Laura Johnson of the Northwest Louisiana Crime Lab testified as to the results of various tests performed on the evidence submitted to them.
Wojtkiewicz's testimony concerned the pattern of blood spatters on the right rear panel of Monds' vehicle and on his pants. On the truck there were approximately eighty spatters, equalling two to three drops of blood. On the pants he identified approximately one hundred spatters equalling one drop of blood. The spatters on the pants were virtually invisible and a magnifying glass was necessary to see them. The truck spatters ranged from ½ to 1½ millimeters in diameter and their origin was two to four feet from the vehicle. The average size of the pants spatters was smaller (each being 1/100th of a drop) and originated two to four feet away.
Laura Johnson is a forensic serologist. Her expertise is analyzing different types of body fluids such as blood, seminal fluid and saliva. In addition she also does microscopic hair and fiber examinations. The results of the various tests she performed on the items submitted to her are as follows:

*543 BRONCO:

The blood spatters on the right rear panel, which amounted to a total of approximately two to three drops, were determined to be human blood. She was not able to type it.
On the interior of the vehicle a small amount of human blood was found on the passenger side of the center console. Johnson could only identify two protein groups, namely ADA-Type 1 and AK-Type 1.[11] Both groups are consistent with Monds' blood and the victim's blood. Other blood found on the console was consistent with only Monds' blood because it had an EAP of type C (same as Monds) while the victim's EAP was BA.[12] Other blood identified on the floormat and the carpet near the console were consistent with only Monds' blood for the same reason.

PANTS:
The spatters of blood on defendant's pants were too small to type or analyze. She could not determine if it was human blood. However, Johnson was able to test six stains near and below the right pocket. She identified each numerically from T-1 to T-6. Johnson testified that the victim's and Monds' blood had the following characteristics.

VICTIM MONDS
ABO groupingTYPE A ABO groupingTYPE O
EAPBA EAPC
ADATYPE 1 ADATYPE 1
AKTYPE 1 AKTYPE 1
ESD[13]TYPE 1 ESDTYPE 1
PGM[14]TYPE 2+1+ PGMTYPE 1+

Of the six stains analyzed, T-3, T-4 and T-5 had type O of the ABO grouping and therefore Johnson made no further testing. T-2 was also type O in the ABO group and had EAP-TYPE C, AK-TYPE 1 and ADA-TYPE 1, which was all consistent with Monds' blood.
Tests on T-1 resulted in an ABO grouping of Type A, AK-type 1 and ADA type 1. The ESD, PGM and EAP factors were not typed. Because forty three (43%) of the population are type A, 93% are AK-type 1 and 93% are ADA type 1, at least 38% of the populations' blood, including the victim, could not be excluded from T-1.
Tests on T-6 resulted in an ABO grouping of type A, EAP type BA, AK type 1, and ADA type 1. The ESD and PGM factors were undetermined. Because of the additional EAP factor, T-6 was consistent with the blood of at least 15% of the population including the victim.
Johnson testified that Vicky Thomas' PGM factor (2+1+) within a Type A of an ABO grouping would have narrowed the population to 8%, however she was not able to do that typing on any of the samples. She also testified that Monds' blood contains a rare EAP enzyme factor (C) and therefore it is a stronger statement to say that the type O blood (T-2) she analyzed came from Monds than to say that the Type A blood (T-1 and T-6) came from Thomas. Furthermore, Johnson testified that Monds' pants had not been washed prior to her tests. The size of the T-1 and T-6 stain were less than ¼ of an inch.

TENNIS SHOES:
The small amount of human blood found on Monds' tennis shoes was unable to be typed.

KNIVES:
The two hunting knives seized by Detective Sproles from Monds' bedroom were also analyzed. No blood was found on the larger knife. Human blood was found on the handle of the smaller, single bladed knife, but was not able to be typed.

BOOTS AND HAT:
Both Monds' boots and camouflage cap were negative for the presence of human blood.

SPERM:
Although the coroner, Dr. George McCormick, found no sperm present in the victim, Johnson testified that she found spermatozoa in the vaginal washings which were sent to the lab. She stated that the sperm was from a Type O secretor and that Monds is a type O secretor. However, she also testified that *544 80% of the male population are secretors and 43% are Type O, meaning 35% are Type O secretors.[15] Vicky Thomas is a type A, nonsecretor.

HAIR:
While Monds' vehicle was at the crime lab, Johnson searched the interior for evidence of Thomas' presence. None was found. She testified the vehicle was "messy and junky" on the inside and did not appear to have been cleaned for a long time. Although five hairs were taken from the passenger floorboard and six from the door sill on the passenger side, none were consistent with the victim. Several were consistent with Monds' hair.
Johnson testified she examined the hair found in the victim's cervix and compared it to Monds' pubic hair. She concluded that the suspect hair was not from the victim and that it had several characteristics similar to that of Monds' hair.[16] She testified, however, that hair comparison is not precise like fingerprint comparison. Hair comparison is "not a method of personal identification ..., but you can exclude someone or you can possibly include someone." The consistent characteristics of the cervix hair and Monds' hair does not exclude Monds, but is not positive proof that it is Monds' hair. Johnson further noted that no two hairs are exactly alike and that there are even differences within a person's own hair.

SURGICAL TAPE:
The first aid kit taken from Monds' truck contained two rolls of surgical tape, a two inch roll and a three inch roll. The three inch roll and the tape used to bind the victim were sent to the FBI laboratory for testing.
Terry Lee Rudolph, special agent, was qualified as an expert in analytical chemistry, particularly in the analysis of polymer materials. He first tried to make an end match to conclude if the tape used to bind the victim came from the roll of tape in Monds' vehicle. He could not make a match. His analysis of the tapes revealed that both had the same chemical composition in the adhesive, both were of weave type (a common basket weave) and both were 3-M Durapore Tape. He did not determine if the ends of the tape were cut or torn.
Rudolph was permitted to testify about the availability of the three inch tape to the public at large. After speaking with various co-workers and factory representatives, he opined that the three inch tape was sold almost exclusively to hospitals and clinics. He concluded that although it is available to the public, there was a low probability that it would be in the possession of most people.[17]

MONDS' TESTIMONY:
James Monds is a surgical technician in the Air Force stationed at Barksdale Air Force Base. He is married to Shay Monds and has one daughter.
On July 5, 1985 one of Monds' co-workers, C.E. Mitchell, organized a party with coworkers to take place later that night. The location of the party was a home C.E. Mitchell shared with his girlfriend Jennifer Durran on Northside Drive. Both Mitchell and Durran worked with Monds. Another co-worker, Paula Warren, needed a ride to the party so Monds agreed to take her.
Monds picked up Warren at her home. While there he talked with Grant Warren, Paula's husband, about Warren's truck. Monds offered advice on repairing the truck and told him he could help.
Monds testified that he left the party on Northside around midnight with Clarence Wilborn and Darrel Richardson to go mud riding in South Shreveport. While driving in various out of the way places, Monds testified that his left rear tire began losing air so he went to a nearby Shell station to have it fixed. He explained the spare tire which was mounted on the rear of his Bronco was also flat.
*545 The Shell station attendant, Bob Kayton, gave Monds the plug and tools to fix the tire because the tire was too big to fix on the tire machine at the station. After the first attempt failed Monds was successful in plugging the tire. He testified that in the process he cut his right hand. He stated it was still bleeding as he searched for his checkbook in the console between the driver's and passenger's seats and over the rest of the truck. Kayton, however, would not accept payment because he couldn't guarantee the plug would hold.
Monds, Wilborn and Richardson then left the station around 1:00 or 1:30 a.m. They rode around a while until Monds spotted a friend, Mike Johnson, in the Toys `R Us parking lot. They stopped and chatted with Johnson for a while.
When they left the Toys `R Us parking lot, Wilborn was driving Monds' truck. Monds directed him to Shreveport Home Garden Iron Works on 6th Street where he showed Wilborn and Richardson the type of iron work he had done while working as a welder.
Monds started driving again and they went downtown to Shreve Square. From there they went to Clyde Fant Parkway where Monds saw a green Bronco parked there that he had seen before. He stopped to talk to the driver about his truck.
From there they drove across the Shreveport Barksdale Bridge and back to Northside Drive where he dropped off Wilborn and Richardson. He then drove down Barksdale Boulevard and returned home. He estimated he arrived home at 3:30 a.m., give or take ten minutes.
On the morning of July 6th, he testified he awoke about 8:30 a.m. and called his brother, Gregory, about Grant Warren's truck. He then went over to Warren's house to help him with his truck. On the way home from Warren's house he cracked a rim on the right front tire of his truck. He noticed this the next day, Sunday, when the tire went flat. His brother, Gregory Monds, brought extra tires to help Monds with his problem. However the tires were not the same size as those on the truck so they put the right rear tire on the right front, the left rear tire on the spare tire rack, and the two tires Gregory brought on the right and left rear.
Monds testified that the first aid kit seized from his truck was not in the truck on the night of July 5th. He explained that he did not assemble the kit until Friday, July 12th because he was taking a course to become an Emergency Medical Technician. He obtained the tape from the operating room at the base hospital and both rolls had been partially used.
Monds explained that the blood on the interior of his truck and on his pants were the result of his searching for money and his check book to pay the Shell attendant while his hand was bleeding from the cut incurred while changing the tire. When asked about the Type A blood on his pants, Monds said he could think of no explanation for that unless some of his hunting companions are Type A and they cut themselves while he was standing near them while they were quartering a deer.
Monds stated the blood on his tennis shoes could have been from a hunting trip or from surgery. He had no knowledge of the pubic hair found inside of Vicky Thomas. He testified he did not know Vicky Thomas and knew nothing of the cause of her death.
Clarence Wilborn and Darrell Richardson corroborated Monds' testimony regarding the events of the evening of July 5th when they went riding together. Wilborn testified that he and Richardson reached their barracks at approximately 3:15 a.m. He noticed the time because they were going to order a Domino's Pizza but realized they could not do so because Domino's closed at 3:00 a.m.
Gregory Monds corroborated the fact that Monds' truck had a cracked rim which necessitated switching the tires on Sunday, July 7th. He, along with his brother Curtis Monds, corroborated the deer hunting trip they went on with defendant in December of 1984 where four or five deer were killed. They testified that James was wearing camouflage pants at the time.
Sergeant Edward Hill testified that he is an orthopedic technician in the Air Force and Monds' co-worker. He recalled Monds putting together a first aid kit because he *546 (Monds) came to him for supplies including bandages and surgical tape. He remembered that Monds gathered these supplies during the week ending July 12, 1985 because he had mentioned to Monds that he should get the supplies he needed then because Hill's superior was returning to work the upcoming Monday, July 15, 1985.

SUFFICIENCY OF EVIDENCE:
For purposes of our analysis we accept as true the testimony presented by the state in its case in chief. We make no credibility determinations and we view all the evidence in the light most favorable to the prosecution. In doing so, we initially conclude that each inference to be drawn from the circumstantial evidence does not exclude the defendant from being Vicky Thomas' murderer. In fact, the gravamen of the State's entire case is that James Monds cannot be excluded as the guilty party. The State argues that the totality of the nonexclusionary evidence is constitutionally sufficient to support the jury's verdict of guilt beyond a reasonable doubt.
We disagree. Because each item of circumstantial evidence does not exclude many other inferences that can be made according to common sense and reason, we find it is insufficient to constitutionally support Monds' conviction.
The sightings by Officers Richmond and Smith infer that Vicky Thomas got in Monds' vehicle in the parking lot of the Teddy Bear Restaurant. However, the officers could not identify the vehicle's driver, nor recall details of the vehicle which were peculiar to Monds' Bronco. For example, they do not remember the huge rear mounted spare tire, the C.B. antenna nor could they recall the license number. At best, their observations were of a vehicle which was similar to that of defendant. Although the sightings do not exclude Monds, anyone else in a Bronco cannot be excluded.
With respect to the surgical tape in Monds' truck, the State's suggested inference is that tape from the same roll of 3 inch tape was used to bind the victim. However, there is absolutely no evidence to support that inference other than the brand of tape is the same. The tape used in the murder could have come from any source.
The blood inside of the Bronco was consistent with Monds' blood. That evidence really infers nothing favorable to the prosecution unless somehow the inference to be made is that Monds cut himself in the perpetration of the murder. However, there is absolutely no evidence to support such an inference.
The sperm found by Laura Johnson was from a type O secretor. Since James Monds is a type O secretor, the inference is that it was his sperm. However so are 35% of the male population who, along with Monds, could have been the source.
We also find that Johnson's testimony concerning the hair found in the victim's cervix, although not excluding Monds, does not exclude other reasonable inferences including the fact it could be Thomas' hair. Johnson admitted hair comparison is not a method of positive identification. Even though she testified that the cervix hair did not have the same characteristics as the sample hair from Vicky Thomas, she also testified that no hairs are exactly the same and that hair from the same person can have different characteristics.
The strongest circumstantial evidence presented by the State is blood stains T-1 and T-6 found on Monds' pants which are consistent with Vicky Thomas' blood. However, stain T-1 could be the blood of at least 38% of the population as well, and stain T-6 could be the blood of 15% of the population. This evidence is probative and given other circumstantial evidence of equal probative weight perhaps a rational juror could reasonably infer it was the victim's blood. But, in our opinion, the inferences from the other circumstantial evidence have very little probative weight in determining guilt or innocence and thus stains T-1 and T-6, standing alone, do not exclude every other reasonable hypothesis of innocence. In our opinion, the evidence in this case is less probative than State v. Williams, supra.
Accordingly, we hold that the evidence used to convict James Monds was constitutionally insufficient to support a verdict of guilt beyond a reasonable doubt. We therefore *547 reverse the conviction and sentence of James Monds and enter a judgment of acquittal.
REVERSED AND RENDERED.
NOTES
[1] This appeal was initially lodged with the Second Circuit Court of Appeal. However, upon the recusal of the judges of that court, the Louisiana Supreme Court transferred the appeal to this court.
[2] The motion to recuse the district attorney became moot when he was elected to the Second Circuit Court of Appeal.
[3] The evidence presented at trial which forms the basis of Monds' conviction is discussed in detail later in this opinion.
[4] The stolen vehicle bulletin originated with Officer Hamm who investigated the stolen vehicle call at about 11:57 p.m., July 5th.
[5] "Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas, circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." State v. Lilly, 468 So.2d 1154 (La.1985) at 1158.
[6] The defendant was a type A secretor, the same as found in the vaginal washings of the victim. A microscopic analysis of the hair on the victim's chest was similar to the defendant. The blood in the victim's car was type A, and defendant's fingerprints were found on the victim's car.
[7] Both officers had been placed under hypnosis in an effort to help them recall the license plate numbers. The session, however, produced no positive results. The attempted discovery of the results of that session is the subject of an error assignment asserted by the defense. Because the first three numbers of the stolen vehicle's license were higher than the T-1 the officers did not pay attention to the remaining other numbers on the Bronco.
[8] At trial, Richmond was shown a photograph identified as S-84. Presumably that was a photograph of Monds' vehicle. Richmond stated that it looked like the one he saw. However, S-84 was not placed in evidence. After considerable searching this court located what apparently is S-84 amongst the exhibits offered at the motion for new trial. There it is identified as D-74. We note this for the reason that the photograph is a side view of the vehicle. It does not show the rear where the spare tire was mounted.
[9] Although the victim's body was nude from the waist down (except for black socks), the victim's top, especially the vertical stripes, was the same as observed by Smith and Richmond.
[10] Sproles' investigative work consisted of "narrowing down" a computer printout list of roughly 20,000 vehicles to ten.
[11] ADA is Adenasine Deaminase, while AK is Adenylate Kinase.
[12] EAP is Erythrocyte Acid Phosphatase.
[13] ESD is Esterase D.
[14] PGM is Phosphoglucomutase.
[15] A secretor is a person whose blood type can be determined from bodily fluids such as semen or saliva.
[16] She concluded it was a pubic hair; the color was the same; it was a caucasian hair; the hairs displayed similar buckling; the cuticle, scales and root appeared the same and the ovoid bodies in the root appeared the same.
[17] We question Rudolph's expertise in the area of market availability of the tape. However, his testimony on this issue was allowed without objection.