764 So.2d 132 (2000)
STATE of Louisiana
v.
Joseph C. WOODFORK.
No. 99-KA-0859.
Court of Appeal of Louisiana, Fourth Circuit.
May 17, 2000.
Writ Denied July 28, 2000.
Christopher A. Aberle, Louisiana Appellate Project, Mandeville, Louisiana, (Attorney for Defendant/Appellant, Joseph Woodfork).
*133 Harry F. Connick, District Attorney, Cate L. Bartholomew, Assistant District Attorney, Juliet Clark, Assistant District Attorney of Orleans Parish, New Orleans, Louisiana, (Attorneys for Appellee, The State of Louisiana).
(Court composed of Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge PHILIP C. CIACCIO, Pro Tempore).
MURRAY, Judge.
On May 11, 1998, Laura Schulte was attacked and her purse stolen. Joseph Woodfork subsequently was arrested, tried and convicted of purse snatching. He was found to be a multiple offender and sentenced to life in prison as a multiple offender. Mr. Woodfork appeals his conviction arguing that it was based on insufficient evidence. He also contends that he received ineffective assistance of counsel because his trial counsel failed to introduce certain evidence.

FACTS LEADING TO JOSEPH WOODFORK'S ARREST:
At approximately 2:00 p.m. on May 11, 1998, Laura Schulte, an employee of the NO/AIDS Task Force, drove her car to 4223 Palmyra Street in order to call on Larry Hornbeck, one of her clients. Ms. Schulte parked her car, and entered the alley leading to Mr. Hornbeck's house. She sensed someone behind her, and turned to see a man who put his finger to his lips and told her to "Shhbe quiet." Ms. Schulte fell forward, started screaming, and began to pound on Mr. Hornbeck's door. The man grabbed her by the arm, and started hitting her. When Mr. Hornbeck began to open the door, Ms. Schulte's attacker grabbed her purse and fled. Mr. Hornbeck chased the man for approximately three blocks, but was unable to catch him.
The attack was reported to the police at approximately 2:18 p.m. Officers Bradley Glaudi and Chris Billiot responded to the call. The officers interviewed Ms. Schulte, who described the man who attacked her as a black male, clean shaven, probably brown eyes, dressed in a type of school uniformkhaki pants, white tennis shoes, and white polo shirt. Mr. Hornbeck, who stated that he had not seen the attacker's face, also was interviewed. The record does not indicate that either witness was asked to view Bureau of Identification photos in an effort to identify her attacker.
Three months later, Ms. Schulte met Joseph Woodfork at her office at the NO/ AIDS Task Force. During this meeting, which lasted approximately five minutes, she explained the assessment process, and scheduled an in-depth interview, which typically takes an hour and a half. Two days later, approximately forty-five minutes into the assessment interview, Ms. Schulte started looking at Mr. Woodfork and started feeling "really funny." She excused herself in order to "regroup." She returned to complete the interview. While doing so she looked at Mr. Woodfork's face, his head, eyes, the color of his skin and his build. She noted that his clothing was identical to that worn by her attacker  white tennis shoes, khaki pants with a pleat, a cotton polo shirt and a white baseball cap. She was extremely distressed by even the remote possibility that the person who had attacked her could be the person in her office.
Not wanting to wrongly accuse someone, Ms. Schulte did not call the police immediately after Mr. Woodfork left her office. Five to seven days later, she contacted Officer Billiott[1]. That same day, Ms. *134 Schulte identified Joseph Woodfork from a photographic lineup compiled by Officer Billiott in response to that contact. Larry Hornbeck also selected Mr. Woodfork's photograph from the line-up, although he admitted having some difficulty in doing so. Joseph Woodfork was arrested and charged with purse snatching. He pled not guilty. On October 13, 1998, following a trial that lasted two hours, a six-person jury found Mr. Woodfork guilty as charged. On January 7, 1999, he was sentenced to serve twenty years. The State filed a multiple bill under La.R.S. 15:529.1. Mr. Woodfork was found to be a quadruple offender, his sentence was vacated, and he was sentenced to life imprisonment[2].

DISCUSSION:
By his first assignment of error Mr. Woodfork contends that the evidence presented at his trial was not constitutionally sufficient to support his conviction.
The Due Process Clause of the Fourteenth Amendment protects a person accused of a crime from being convicted unless the State proves every element of the offense charged beyond a reasonable doubt. This constitutional protection is the basis of a reviewing court's duty to determine the sufficiency of the evidence used to convict a defendant. State v. Monds, 91-0589 (La.App. 4 Cir.1994), 631 So.2d 536, writ denied 94-0626 (La.4/22/94), 637 So.2d 164. In deciding whether evidence is constitutionally sufficient to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
The appellate court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988); State v. Monds, supra at p. 4, 631 So.2d at 539. If the reviewing court finds that no rational trier-of-fact, viewing all the evidence from a rational pro-prosecution viewpoint, could have found the defendant guilty beyond a reasonable doubt, the conviction cannot stand constitutional muster. Mussall, supra.
The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992); Mussall, supra. As noted by the Supreme Court, "the court is not to substitute its judgment of what the verdict should be for that of the jury, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt." Mussall, supra, citing 2 Charles Allen Wright, Federal Practice & Procedure, Criminal 2d, Sec. 467, at 660-661 & n. 23 (2d ed.1982).
In this case, Mr. Woodfork gave notice that he would present alibi evidence. Consequently, the key issue in this case was whether he was the person who attacked Ms. Schulte. Therefore, in order to carry its burden of proof under the Jackson rationale, the State was required to negate any reasonable probability of misidentification. State v. Edwards, 97-1797 (La.7/2/99), 750 So.2d 893, cert. denied, ___ U.S. ___, 120 S.Ct. 542, 145 L.Ed.2d 421 (1999); State v. Smith, 430 So.2d 31, 45 (La.1983).
The identifications of Mr. Woodfork by Ms. Schulte and Mr. Hornbeck were the only evidence that linked him to this *135 crime. Although eye witness testimony alone is sufficient evidence to satisfy the State's burden in most cases, the Louisiana Supreme Court has recognized that there are instances in which "numerous eccentricities, unusual coincidences and lack of corroboration" make such testimony so unreliable that even a reasonably pro-prosecution rational fact finder must have a reasonable doubt about the identification. Mussall, 523 So.2d at 1311. This case is such an instance.
One of the witnesses who made this critical identification never saw the face of the man who attacked Ms. Schulte. Mr. Hornbeck testified that he looked through his window and saw a man hitting Ms. Schulte on the top of her head. However, because Ms. Schulte was between him and her assailant, Mr. Hornbeck did not see the man's face at that time. Although he chased the man for three blocks, Mr. Hornbeck was never closer than four feet behind him. He testified that, at the time of the incident, he could not describe the man. On cross-examination, Mr. Hornbeck acknowledged that he had trouble identifying Mr. Woodfork from the photographic lineup. He attributed his difficulty with the identification to confusion based on his recollection, from the time of the incident, that the man's eyes were "really bulging." Mr. Hornbeck admitted having discussed the incident with Ms. Schulte between May and August. He also admitted that he had talked to Ms. Schulte right after she identified Mr. Woodfork when she called to ask him if "some police came by."
Unlike Mr. Hornbeck, Ms. Schulte saw her attacker's face. However, by her own admission, she did so for only a matter of seconds. She testified that she noticed a man coming down the street as she got out of her car on Palmyra Street. The man was behind her as she removed her belongings from the back seat and locked the car, and in front of her as she walked from her car to the entrance to the alley. At that point he turned and crossed back behind her. As she entered the alley, Ms. Schulte sensed someone behind her, and turned to see the man who had been on the street earlier. Although she felt that she got a good look at him at that time, she admitted that this was the last time she saw her attacker's face as she immediately doubled over to protect herself and did not look up again until he had fled with her purse.
Ms. Schulte's description of her assailant focused on what he was wearing: khaki pants, a white polo-style shirt, a white baseball cap and tennis shoes. She could not remember any particular facial feature, height, weight, or build. Ms. Schulte could not describe her attacker's eyes, except to say that she "wasn't comfortable with them." When questioned about this, she explained that she had seen the "look" on her attacker's face before, and that she felt he could have been on drugs.
Ms. Schulte admitted having discussed the incident with Mr. Hornbeck on at least two occasions after May 11. The first occurred three or four weeks after the attack, when Mr. Hornbeck called to tell her that he thought he had seen the man who attacked her. During this conversation they discussed the description of her attacker so that they could verify that the man Mr. Hornbeck had seen looked like the mugger. Ms. Schulte and Mr. Hornbeck discussed the incident again after she had called the police. She explained that she called Mr. Hornbeck to tell him that the person who had mugged her had been in her office, that she had called the police, and that he should be expecting their call.
Three months after this incident Ms. Schulte was introduced to Mr. Woodfork, but did not recognize him as her attacker. Two days later she spent approximately forty-five minutes face-to-face with Mr. Woodfork, before realizing that he looked like the person who had mugged her. Ms. Schulte was so upset that she was forced to excuse herself from the interview. When she returned she began to look at *136 Mr. Woodfork. She noted that he had on the exact same clothes as the man who mugged herwhite tennis shoes, khaki pants with a pleat, a beige and white cotton polo shirt and a white baseball cap. Ms. Schulte was not sure that Mr. Woodfork was her attacker, and she did not want to accuse the wrong person. Therefore, she did not call the police immediately after the interview ended. Instead sh@e wanted time to reflect on the matter. Five to seven days passed between her "recognizing" Mr. Woodfork in her office and her call to Officer Billiot. Once Ms. Schulte gave a name to the Officer, he was able to put together a photographic lineup that included Mr. Woodfork's picture. Not surprisingly, Ms. Schulte, who had spent an hour and a half face-to-face with Mr. Woodfork, had no difficulty in selecting his picture from the lineup.
Mr. Woodfork took the stand in his own defense, and denied having attacked Ms. Schulte. He testified that he was working at Blue Plate Mayonnaise at the time of the attack. He explained that he had applied for temporary work through the NO/ AIDS Task Force Temporary Service, and started work on Monday, May 11. He arrived at Blue Plate at 6:00 a.m., and was assigned to work on a conveyor belt line. He also testified that his social security number is XXX-XX-XXXX.
Mr. Woodfork's alibi was corroborated by two independent witnesses: Bernard Carter of the NO/AIDS Task Force Temporary Service and Theresa Walker, an employee of Reily Foods working at the Blue Plate Mayonnaise plant.
Mr. Carter testified that he assigned Joseph Woodfork to work at Blue Plate on May 11, 1998. Mr. Woodfork went to work at approximately 6:00 a.m. for a ten hour shift. Although Mr. Carter did not drive him to the job site, he testified that Mr. Woodfork was in the hall and was put on the work order for Blue Plate. Mr. Carter also testified that he had received no calls from Blue Plate advising that anyone listed on the May 11 work order had failed to report to work.
Ms. Walker testified that her research of the Blue Plate records revealed a time card for Joseph Woodfork, social security number XXX-XX-XXXX, that indicated he was employed at the plant on Monday, May 11, 1998, having clocked in at 6:08 a.m. The time card showed that Mr. Woodfork clocked out for lunch between 12:00 and 12:30, and clocked out for the day at 4:30 p.m. Ms. Walker testified that workers at Blue Plate do not get paid if they are not working. Although employees have been known to walk out, no one could be gone from the line for more than ten minutes without her or the line supervisor knowing about it. She explained that the production line "goes and goes and if someone's missing, it's obvious and they are looked for."
After careful consideration we are constrained to conclude that the evidence presented does not negate the reasonable probability of a misidentification. The identifications of Mr. Woodfork as Ms. Schulte's attacker raise a serious question as to their reliability: Mr. Hornbeck admitted that he never saw the mugger's face; he and Ms. Schulte discussed the incident and compared notes on the attacker's description on at least two occasions, one on the date the identifications were made; Ms. Schulte had a very limited opportunity to view her assailant's face, and was unable to describe him except with regard to his clothing and the fact that something about his eyes made her "uncomfortable;" She did not recognize Mr. Woodfork during their first meeting or the first forty-five minutes of the second meeting; she was uncertain about the identification until she had an opportunity to reflect upon the matter for approximately a week. In addition, two independent witnesses corroborated Mr. Woodfork's testimony that he was working at some distance from Palmyra Street at the time of the incident.
*137 For these reasons, we conclude that any rational juror, viewing this evidence in the light most favorable to the prosecution, necessarily must have had a reasonable doubt as to Mr. Woodfork's guilt. Because the evidence used to convict Joseph Woodfork was constitutionally insufficient to support a verdict of guilty beyond a reasonable doubt, we reverse the conviction and sentence of Joseph Woodfork and enter a judgment of acquittal.
REVERSED.
NOTES
[1] 1 Although Ms. Schulte testified that the initial meeting with Mr. Woodfork took place on August 6, 1998 and the second interview on August 8, she was certain that the second interview was on a Thursday. August 8, 1998 fell on a Saturday. Therefore, it would seem most likely that the initial interview occurred on Tuesday, August 4, and the in-depth interview on Thursday, August 6. The notations on the backs of the photographic line-ups indicate that Ms. Schulte and Mr. Hornbeck each made their identifications on Thursday, August 13, 1998.
[2] On October 16, 1979, Mr. Woodfork pled guilty to simple burglary; on March 20, 1987 he pled guilty to burglary of an inhabited dwelling; on September 21, 1992, he pled guilty to possession of cocaine.