800 So.2d 1116 (2001)
STATE of Louisiana
v.
Jermaine A. BREALY.
No. 2000-KA-2758.
Court of Appeal of Louisiana, Fourth Circuit.
November 7, 2001.
*1117 Harry F. Connick, District Attorney of Orleans Parish, Anne M. Dickerson, Assistant District Attorney of Orleans Parish, New Orleans, LA, Counsel for Plaintiff/Appellee.
Graham da Ponte, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judges CHARLES R. JONES, PATRICIA RIVET MURRAY, and TERRI F. LOVE.
Judge PATRICIA RIVET MURRAY.
Defendant, Jermaine Brealy, appeals his conviction of first degree murder. For the reasons stated, we reverse the conviction and remand for a new trial.
On November 12, 1998, an Orleans Parish grand jury indicted Jermaine Brealy for first degree murder, a violation of La. R.S. 14:30. He pled not guilty at his arraignment. On January 8, 1999, the district court heard and denied the motion to suppress the identification. On June 1, 1990, immediately prior to trial, the district court denied Mr. Brealy's motion in limine. On June 4, 1999, a twelve-person jury found the defendant guilty as charged. At the conclusion of the penalty phase, the jury returned a unanimous sentencing recommendation of life imprisonment without benefit of probation, parole or suspension of sentence. Mr. Brealy filed a motion for new trial, which the court denied on August 30, 1999. On the same day, after the defendant waived all legal delays, the court sentenced him in accordance with the jury's verdict. The court granted his out-of-time appeal on March 3, 2000.
*1118 Jermaine Brealy asserts two assignments of error: (1) that the evidence was insufficient to convict; and (2) that the trial court committed reversible error by denying the motion in limine.

FACTS
On the morning of April 18, 1999, Paul Krough, who worked for an armored car company, and his partner, Nicole Johnson, attempted to make a pickup of U.S. currency from the supermarket located at the intersection of South Claiborne and South Carrollton Avenues.[1] After collecting the money, Mr. Krough was returning to the armored vehicle when he was approached by an armed subject, who shot him in the neck and upper chest, killing him.
The driver of the armored van, Nicole Johnson, was seated in the cab of the vehicle when these events transpired. This was Ms. Johnson's fourth or fifth day on the job. The front of the armored van was facing the entrance of the store. Ms. Johnson observed her partner, Paul Krough, exit the store and walk towards the vehicle, and at the same time she saw a man creeping along a car towards him. She then saw the man raise a gun and point it at Mr. Krough. At this point Mr. Krough reached for his gun, and the man said something, which Ms. Johnson did not hear because the windows were up in her vehicle, just before firing his weapon at Mr. Krough. Ms. Johnson testified that she could hear and see the shots. After shooting Mr. Krough, the man grabbed the money bag, turned towards Ms. Johnson, and looked at her. Ms. Johnson testified that they made eye contact. In fear that she would be shot, Ms. Johnson ducked down. When she looked up again, she saw the man running in the direction from which he came.
Ms. Johnson also testified that she believed there were two perpetrators because after the shots were fired, everyone ran except one person, who just stood there. However, when the perpetrator ran, this second subject followed him.
Following the incident, Ms. Johnson gave police a written statement, which reflects that she identified the gunman as a black male, 5' 7" tall and about 175 lbs., of medium build, with a fade style haircut and wearing a red short sleeve t-shirt and dark blue jean shorts. She described the second subject as a black male, about 5' 11" tall, of medium build, wearing a gray t-shirt and short dark pants. On May 4, Ms. Johnson met with Johnny Daniels, the composite artist for the New Orleans Police Department, who prepared a composite sketch of the perpetrator with her assistance.
Neil Buie testified that he was seated in his car in the supermarket parking lot doing office work on the day in question. Mr. Buie was working as a manager for Brown's Velvet Dairy and was awaiting arrival of the delivery truck. His car was in the first row and was facing the building. He testified that he heard the sound of two pops coming from his right and then observed people running. Mr. Buie ducked down, but his attention was drawn to a subject who was running, whom Mr. Buie could see out of the rear passenger window of his car. He testified that he provided a description of this individual as being rather tall with a thin build, wearing long dark pants and a white t-shirt. The most he could see was a side view of the individual's face.
When Mr. Buie looked through his rear view mirror, he observed a second man *1119 running with the first. Mr. Buie testified that this man was wearing a dark shirt and dark blue pants. He did not see this man's face.
Officer Winston Harbin testified that he prepared the initial report. In doing so, he obtained a description of the perpetrators from Neil Buie, who described subject number one as a black male about twenty to twenty-five years old, dark complexion, approximately 5' 10" and 175 lbs, wearing a dark colored and white striped shirt with a collar, short sleeves, long black/blue denim pants and white tennis shoes. This subject was carrying a white bag. Mr. Buie described the second subject as being a black male, brown complexion, between fifteen and twenty years of age, approximately 6' and 160 lbs., wearing a white t-shirt, short sleeves, and black denim long pants.
John Rist, an assistant manager employed by the armored car company, testified that four hours after the incident, he took a statement from Nicole Johnson. Mr. Rist described Ms. Johnson's demeanor at the time as calm. She described the perpetrator as about twenty-five years old, 5'7" tall, 175 lbs., of medium build, with a dark-medium complexion, natural haircut, wearing a red t-shirt and blue jean shorts.
Detective Wayne Farve was the lead homicide detective investigating the case. He testified that following the crime he received a radio dispatch relative to the location of two possible perpetrators. Apparently this information was provided by an anonymous source. The detective was able to speak with one subject, Lamar Parker, who denied involvement in the crime. Detective Farve conducted a search of Mr. Parker's residence, where another subject, identified as Lamalace Hardwell, was located. The detective compiled a photographic lineup of Mr. Parker and another suspect, Terry Bagneris. He presented these lineups to both Neil Buie and Nicole Johnson. Neither Ms. Johnson nor Mr. Buie identified either subject. In June, Detective Farve learned that Lamar Parker had a brother, and he compiled another photographic lineup containing Trevor Parker, the brother, and the subject located in the residence, Lamalace Hardwell. Nicole Johnson did not identify either subject. Neil Buie was also shown these lineups, and he identified Trevor Parker; however, he stated that if he saw him in person or saw a physical lineup, he could be more positive of his identification. Mr. Buie did not identify Mr. Hardwell.
Trevor Parker was arrested pursuant to a warrant, and Detective Farve assembled a physical lineup including five additional subjects with the same approximate height weight, physical description and skin tone. At the lineup, Mr. Buie identified someone other than Trevor Parker. Mr. Parker was then released from custody.
Subsequently, Detective Farve received a telephone tip, which prompted him to compile two more photographic lineups containing Jonas Lang and the defendant, Jermaine Brealy. Neil Buie did not identify either subject; however, on September 5, 1998, Nicole Johnson identified Mr. Brealy. Detective Farve first presented the lineup of Mr. Lang to Ms. Johnson, and she did not see anyone in the lineup she could identify. He then showed Ms. Johnson the lineup that included Mr. Brealy's photograph. The detective placed the six pictures on the table face up and turned away briefly when Ms. Johnson stated, "That's him right there", while pointing to the photograph of Jermaine Brealy.
Following the identification, Detective Farve secured a warrant for Jermaine Brealy's arrest, and Mr. Brealy subsequently turned himself in. On November *1120 10, 1998, Detective Farve arranged a physical lineup, which both Ms. Johnson and Mr. Buie attended. After being shown the subjects in the lineup, Ms. Johnson was asked if she could identify anyone, and she related, "No, I'd have to look again." She was not provided with an additional opportunity to view the lineup and the procedure was concluded.[2] Apparently, Mr. Brealy's attorney objected to having Ms. Johnson view the lineup again, and Detective Farve and the Assistant District Attorney, Margaret Hay, decided not to let the witness view the lineup a second time.[3]
Jermaine Brealy testified that on the day of the murder he was at home with several family members. He recalled the day because his aunt had called to inform them of the events at the supermarket, which was within a ten or twelve block radius of where he and several of his relatives lived. Furthermore, he recalled that his girlfriend was having contractions at an early stage of her pregnancy that day. He further testified that, at the time of the murder, he had three gold teeth across the top front of his mouth and he wore a bush hairstyle, but conceded that in 1997, he had worn a fade style haircut. Jermaine Brealy was eighteen years old at the time of the murder.

ERRORS PATENT
A review of the record for errors patent reveals none.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant asserts the evidence was constitutionally insufficient because the State failed to establish beyond a reasonable doubt that he committed the crime in question. The Due Process Clause of the Fourteenth Amendment protects a person accused of a crime from being convicted unless the State proves every element of the offense charged beyond a reasonable doubt. This constitutional protection is the basis of a reviewing court's duty to determine the sufficiency of the evidence used to convict a defendant. State v. Monds, 91-0589 (La.App. 4 Cir.1994), 631 So.2d 536. In deciding whether evidence is constitutionally sufficient to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987).
The appellate court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988); State v. Monds, supra, p. 4, 631 So.2d at 539. If the reviewing court finds that no rational trier-of-fact, viewing all the evidence from a rational pro-prosecution viewpoint, could have found the defendant guilty beyond a reasonable doubt, the conviction cannot stand constitutional muster. Mussall, supra. When identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Smith, 430 So.2d 31, 45 (La.1983).
The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction *1121 is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992); Mussall, supra, at 1311. As noted by the Supreme Court, "the court is not to substitute its judgment of what the verdict should be for that of the jury, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt." Mussall, supra, at 1311 (citation omitted). Although a conviction based solely on the identification testimony of one witness may withstand a sufficiency of the evidence test, it will do so only "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence. ...." State v. Gipson, 26,433, p. 2 (La.App. 2 Cir. 10/26/94), 645 So.2d 1198, 1200.
Mr. Brealy correctly notes that the State's case rested solely on the identification of him by Nicole Johnson. No physical evidence or other corroborating evidence was submitted to establish his guilt.
In Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977), the Supreme Court set forth a five-factor test to determine whether an identification is reliable: (1) the opportunity of the witness to view the assailant at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the assailant; (4) the level of certainty demonstrated by the witness; and, (5) the length of time between the crime and the confrontation. See also: Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); State v. McNeal, 99-1265, p. 6 (La.App. 4 Cir. 6/14/00) 765 So.2d 1113, 1117, writ denied, 2000-2134 (La.9/28/01), 797 So.2d 684.
Examining these factors in relation to the instant case, we find that factors (1), (2), and (4) preponderate in favor of the reliability of Ms. Johnson's identification; whereas, factors (3) and (5) tend to cast some doubt. Regarding factor (1), Ms. Johnson's opportunity to view the offender, she testified it was a well-lit day, and she had an unobstructed view of the perpetrator through the windshield of her vehicle, about twelve feet away. Moreover, she looked the perpetrator squarely in the eye for a moment before she ducked down in fear. As to factor (2), Ms. Johnson's degree of attention was clearly high in light of fact that she watched the crime unfold after first noticing the perpetrator creeping alongside a parked car. Additionally, she testified that it was her job to remain in the van and watch the front door of the store as her partner went in and came out.
As to factor (4), the level of certainty displayed at the confrontation, Ms. Johnson did not express any degree of reservation when she identified Jermaine Brealy in the photographic lineup. Moreover, the fact that she had viewed five prior lineups on two separate occasions without having identified anyone tends to make her identification in this instance more probative. Mitigating against this certainty, of course, is that Ms. Johnson was unable to identify the defendant at the physical lineup within the time allotted, despite the fact that she had so readily identified his photograph. However, Ms. Johnson did relate that she was quite nervous and scared at the physical lineup because, despite having been told otherwise, she still believed "in her mind" that the subjects in the lineup could see her. At trial, Ms. Johnson reaffirmed that she had "no doubt" that the defendant was the person who shot her partner.[4]
*1122 Factor (3) is the accuracy of the witness' prior description of the offender. Ms. Johnson's initial description was of a black male, 5'7" tall and weighing 175 pounds. Mr. Brealy testified without contradiction that he was 6' 1½" and between 140-145 lbs. The discrepancy between the witness' description and the reality of defendant's stature is significant. Not only is Jermaine Brealy much taller than the person Ms. Johnson described, but he also is much lighter. Essentially, Nicole Johnson described a short, stocky individual, while Mr. Brealy is tall and thin. Additionally, the clothing description provided by Ms. Johnson conflicts with that given by Mr. Buie. Finally, factor (5), the period of time between the crime and the initial identification, was great, some five months having transpired.
Besides weighing these five factors, this court must also consider that the jury made a credibility determination and chose to accept Nicole Johnson's testimony. On balance, we conclude that the testimony of this one eyewitness was sufficient, albeit barely, for the State to meet its burden of negating any reasonable possibility of misidentification and of proving beyond a reasonable doubt that the defendant committed this crime.

ASSIGNMENT OF ERROR NUMBER TWO
Prior to trial, defendant filed a motion in limine to preclude the prosecution from commenting on or eliciting any testimony regarding the fact that at the physical lineup, defense counsel had objected to Nicole Johnson viewing the lineup a second time. The trial court denied the motion, ruling that "since identification is the essential issue, it seems the jury has a right to hear everything .... that transpired with regard to the identification." During the direct examination of Detective Farve, the State introduced the following testimony regarding counsel's objection:
A. She stated, "No, I'd have to look again."
Q. Now was she afforded the opportunity to look again?
A. No, she was not. [At this point an objection was entered and overruled.]
Q. And were you aware of the reason why she was not allowed to look again?
A. Yes, I was.
Q. And what was that reason?
A. Mr. Williams [defense counsel] objected to her viewing the lineup again.
Furthermore, during closing argument, the prosecutor, after relating that Nicole Johnson needed to look again, stated, "And what happens, Mr. Williams, says, no, I object, don't go in there and look again. Out of an abundance of caution Ms. Hay [the assistant district attorney assigned to the case] agreed with him and said, okay."
La. C.E. art. 402 prohibits the introduction of evidence that is not relevant. Relevant evidence is defined in La. C.E. art. 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Furthermore, La. C.E. art. 403 provides that even evidence that is relevant should be excluded if its probative value is outweighed by its potential for prejudice or confusion of the issues, or if it is misleading.
Mr. Brealy argues that his counsel's objection to Nicole Johnson's viewing the lineup a second time was not relevant evidence because it did not tend to make the existence of any fact of consequence to the determination of defendant's guilt or innocence more or less probable, and further, that he was prejudiced by its introduction. We agree. While Nicole Johnson's *1123 identification was essential to the outcome of the trial, the fact that defense counsel objected to her viewing the lineup a second time was not relevant to the issue. Moreover, this evidence was clearly prejudicial, especially in light of Ms. Johnson's further testimony concerning her desire to continue viewing the physical lineup, to wit:
Q. Did you look at all of them for five minutes?
A. I looked at everybody, but I was focusing on one person.
Q. For five minutes?
A. For a good while. And I wanted to make sure that was the person before I picked him out. That was my purpose of trying to focus.
* * *
Q. And when you were called out there, you were asked, "Can you positively identify the person that was involved in the murder, robbery?"
A. I wanted to. I wanted to get the right person. That was my whole purpose oflook, I didn't, that was my first time ever going to a lineup. I thought you could get as long as you want to to [sic] look at the person and they just said, "Time's up." And
* * *
A. I don't know if they said, "Time up" or, all I know is that it was time for me to get up. I thought that when I go to the back, I could say I wanted to see again. I didn't know that it was over with. But basically, I was really trying to focus on the person who shot Paul, and that's what I wanted to do. And that's the person who I focused on. And before I could give my answer, it was time.
Q. You were asked, you were asked
A. I didn't know that I just blurt out that's him right there. I didn't, I thought that you could go in the back and say
In our view, this testimony of Nicole Johnson clearly invites the inference that she would have identified Jermaine Brealy if she had been given more time to view the physical lineup. Making this inference, the jury reasonably could have concluded that defense counsel's objection to continuing the lineup unfairly prevented Ms. Johnson from making the identification, and could, therefore, have discounted her inability to identify Mr. Brealy as a consequence of defense tactics. Moreover, the prosecution's decision to pursue this issue during its case in chief and argument, clearly placing the blame on defense counsel (even though the prosecuting attorney acquiesced to ending the lineup at that point) compounds the prejudice. The State has a right to compel a defendant's participation in a physical lineup; the presence of counsel at a lineup is primarily intended to prevent unfairness. State v. Thomas, 406 So.2d 1325, 1328 (La.1981); State v. Carter, 98-24, p. 12 (La.App. 5 Cir. 5/27/98) 712 So.2d 701, 707. In the instant case, we do not believe that affording the victim an additional amount of time to view the lineup would have impinged on the overall fairness of the procedure.
Therefore, we conclude that the trial court erred by denying the motion in limine, and that the evidence allowed to be introduced as a result of that denial was clearly prejudicial to the defendant. We also cannot say beyond a reasonable doubt that the error was harmless, or that the guilty verdict actually rendered in the trial was unattributable to the error. See: Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Sullivan *1124 v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).
Had Jermaine Brealy's conviction been supported by any evidence other than the identification by Nicole Johnson, the impact of the extraneous testimony and commentary would likely have had little bearing on the outcome of the trial. However, because the State's case teeters precariously close to being constitutionally insufficient, the relevant impact of the error is much more severe, and we are compelled to conclude that the improperly introduced evidence could have played a role in the verdict.

CONCLUSION
Because we find that the trial court improperly denied the motion in limine and that this error was not harmless, we reverse the defendant's conviction and remand for a new trial.
CONVICTION REVERSED; REMANDED.
NOTES
[1] The supermarket is alternatively referred to throughout the testimony as either "Schwegmann's" or "Canal Villere".
[2] It was estimated that the lineup lasted approximately five minutes. Ms. Johnson was seated on the third row of the auditorium.
[3] Mr. Buie tentatively identified a fill-in at the lineup.
[4] Further testimony of Mr. Johnson concerning the physical lineup and the implications of that testimony are addressed in our discussion of Assignment of Error Number Two, infra.