Cooks, J.
dissenting.
hi respectfully disagree with the majority’s holding. I believe the law applied to the facts here establishes this is a case of circumstantial evidence only. Thus, Defendant’s claim of insufficiency of evidence must be evaluated not under the reasonable doubt standard, as the majority applies, but under the analysis that determines whether “the evidence excludes every reasonable hypothesis of innocence.” State v. Draughn, 05-1825, p.7 (La.1/17/07), 950 So.2d 583, 592, cert denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). See also La.R.S. 15:438. Additionally, I am convinced the evidence shows the State failed to meet its burden of proof. I also believe the trial court legally erred in failing to properly instruct the jury on the State’s burden of proof in a case involving only circumstantial evidence. Defendant’s counsel twice requested a jury instruction be added informing the jury of the State’s burden to prove guilt by presenting evidence sufficient to exclude every reasonable hypothesis of innocence in cases involving only circumstantial evidence. The trial judge, freely admitting this was her first criminal trial, accepted the State’s argument that Defendant’s statement to police when coupled with Daniel Guillot’s (Guil-lot) testimony, meant there was direct evidence in the case. This argument was not correct as to the three |2shootings. This error of law mandates a reversal of the conviction and a remand for new trial.
The majority opinion does not discuss whether the case is one based solely on circumstantial evidence, direct evidence, or a combination thereof, but merely concludes the evidence is sufficient to convict Defendant beyond a reasonable doubt. In this case the determination of the proper burden of proof is critical. Further, the evidence to my mind is insufficient to establish guilt beyond a reasonable doubt and does not come close to excluding eveiy reasonable hypothesis of innocence. The “lack of sufficient evidence to sustain the conviction would entitle defendant to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 44-45, 101 S.Ct. 970, 67 L.Ed.2d 30 (1981).” State v. Rodricus C. Crawford, 2014-2153, (La. 11/16/16) _ So.3d _, 2016 WL 6780518, citing Hudson and State v. Mickelson, 12-2539, p.5 (La. 9/3/14), 149 So.3d 178, 182. In Crawford the state supreme court, relying on State v. Davis, 92-1623 (La. 5/23/94), 637 So.2d 1012, recently explained the Jackson standard[1] applied to circumstantial evidence cases as follows:
*363 In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under Jackson v. Virginia[.]
The Jackson standard does not permit this court to substitute its own appreciation of the facts for that of the factfinder. State v. Robertson, 96-1048, p. 1 (La. 10/4/96), 680 So.2d 1165, 1166. It is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443. As explained in State v. Mussall, 523 So.2d 1305, 1310 (La. 1988):
lijlf rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all of the evidence most favorable to the prosecution must be adopted. Thus, irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnote omitted.]
Crawford, 2014-2153 at p. 9.
A review of the evidence presented in this case discloses numerous significant contradictions and inconsistencies when compared to Defendant’s admissions. The evidence when viewed in the light most favorable to the prosecution does not exclude every reasonable hypothesis of innocence. Moreover, the evidence is insufficient under the Jackson standard to rationally support a conviction as to the three shootings. In State v. Coleman, 02-634, pp. 5-6 (La.App. 4 Cir. 10/23/02), 831 So.2d 375, 378, writ denied, 02-3197 (La.12/19/03), 861 So.2d 562, (emphasis added) the fourth circuit, reiterating its previous holding in State v. Brealy, 00-2758 (La.App. 4 Cir. 11/5/01), 800 So.2d 1116, 1120-21, said:
The Due Process Clause of the Fourteenth Amendment protects a person accused of a crime from being convicted unless the State proves every element of the offense charged beyond a reasonable doubt. This constitutional protection is the basis of a reviewing court’s duty to determine the sufficiency of the evidence used to convict a defendant. State v. Monds, 91-0589 (La.App. 4 Cir.1994), 631 So.2d 536. In deciding whether evidence is constitutionally sufficient to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987).
I/The appellate court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305, 1311 (La.1988); State v. Monds, supra, p. 4, 631 So.2d at 539. If the reviewing court finds that no rational trier-of-fact, viewing all the evidence from a rational pro-prosecution viewpoint, could have found the defendant guilty beyond a reasonable doubt, the conviction cannot stand constitutional muster. Mussall, supra. When identity is disputed, the state must negate any reasonable proba *364 bility of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt. Jackson v. Virginia, supra; State v. Smith, 430 So.2d 31, 45 (La.1983).
The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. State v. Smith, 600 So.2d 1319, 1324 (La.1992); Mussall, supra, at 1311. As noted by the Supreme Court, “the court is not to substitute its judgment of what the verdict should be for that of the jury, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.” Mussall, supra, at 1311 (citation omitted). Although a conviction based solely on the identification testimony of one witness may withstand a sufficiency of the evidence test, it will do so only “[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence....” State v. Gipson, 26,433, p. 2 (La.App. 2 Cir. 10/26/94), 645 So.2d 1198, 1200.
The Louisiana State Supreme Court in State v. Neal, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, made it clear “As a general matter, when the key issue is the defendant’s identity as the perpetrator, rather than whether the crime [¿was committed, the State is required to negate any reasonable probability of misidentifi-cation.” (citations omitted) This forms part of the proper framework for this court’s review of this conviction. One significant question here is whether the evidence sufficiently shows the State successfully negated “any reasonable probability” that Defendant was misidentified. Additionally, the veracity of Defendant’s admissions of fact is seriously undermined by 1) the coercive nature under which these admissions were obtained from a youthful person over a period of five hours; 2) by the suggestive manner through which the police directed Defendant’s admissions; and 3) by the contradictory and inconsistent evidence presented at trial. The numerous instances of evidence contradicting or failing to substantiate Defendant’s “admissions” demonstrate the State failed to exclude every reasonable hypothesis of innocence and failed to negate the reasonable probability of misidentification of Defendant.
The United States Supreme Court has often recognized and wrestled with the persistent problem of false confessions or admissions. As the court observed in J.D.B. v. North Carolina, 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011):
Any police interview of an individual suspected of a crime has “coercive aspects to it.” Oregon v. Mathiason, 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam). Only those interrogations that occur while a suspect is in police custody, however, “heighte[n] the risk” that statements obtained are not the product of the suspect’s free choice. Dickerson v. United States, 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).
By its very nature, custodial police interrogation entails “inherently compelling pressures.” Miranda [v. Arizona], 384 U.S. [436], at 467, 86 S.Ct. 1602 [16 L.Ed.2d 694 (1966) ]. Even for an adult, the physical and psychological isolation of custodial interrogation can “undermine the individual’s will to resist and ... compel him to speak where he would not otherwise do so freely.” Ibid. Indeed, the pressure of custodial interrogation is so immense that it “can induce a frighteningly | fihigh percentage *365 of people to confess to crimes they never committed.” Corley v. United States, 556 U.S. 303,129 S.Ct. 1558, 1570, 173 L.Ed.2d 443 (2009) (citing Drizin & Leo, The Problem of False Confessions in the Post-DNA World, 82 N.C.L.Rev. 891, 906-907 (2004)); see also Miranda, 384 U.S., at 455, n. 23, 86 S.Ct. 1602. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. See Brief for Center on Wrongful Convictions of Youth et al. as Amici Curiae 21-22 (collecting empirical studies that “illustrate the heightened risk of false confessions from youth”).
Recognizing that the inherently coercive nature of custodial interrogation “blurs the line between voluntary and involuntary statements,” Dickerson, 530 U.S., at 435, 120 S.Ct. 2326, this Court in Miranda adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination ,.. And, if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a “prerequisit[e]” to the statement’s admissibility as evidence in the Government’s case in chief, that the defendant “voluntarily, knowingly and intelligently” waived his rights. Miranda, 384 U.S., at 444, 475-476, 86 S.Ct. 1602; Dickerson, 530 U.S., at 443-444, 120 S.Ct. 2326.
J.D.B. v. N. Carolina, 564 U.S. 261, 268-70, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (U.S.2011) (emphasis added).
In Corley, addressing the six hour provision provided in 18 U.S.C. § 3501, the high court found the statute was meant only to limit the McNabb-Mallory[2] presentment exclusionary rule, not eliminate it. That legislation provides that a confession is not inadmissible “‘solely because of delay in bringing such person before a magistrate judge ... if such confession is found by the trial judge to have been made voluntarily and ... within six hours [of arrest]; it extends that time limit when further delay is ‘reasonable considering the means of transportation and the distance to ... the nearest available [magistrate].’” Corley, 129 S.Ct. at 1559.
|7The United States Supreme Court reasoned:
In a world without McNabb-Mallory, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to. See McNabb, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far. “[C]ustodial police interrogation, by its very nature, isolates and pressures the individual,” *321 Dickerson, 530 U.S., at 435, 120 S.Ct. 2326, and there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed ....
Corley, 556 U.S. at 320-21, 129 S.Ct. 1558(citation omitted) (emphasis added).
I believe the Defendant in this case is a prime example of a young person, who after over five hours in police custody, made false admissions concerning crimes he did not participate in. An examination *366 of Defendant’s version of the facts obtained by the police interrogator’s suggestive questioning resulted in what the evidence shows to be false admissions of facts which formed the basis of a flawed conviction. It appears to me from my review of the record that the police had a theory of the chain of events concerning the three shootings and guided Defendant’s admissions in accordance with their chronology of events which proved to be incorrect at trial.
In his admissions of fact Defendant told police the following:
Q: Okay. Alright Tedrick there was uh incident that happened uh on uh yesterday uhm which started on Monroe Street. Start telling us what happened starting from Monroe Street ...
[[Image here]]
A: Okay we rode ... uh at first I was the driver. And then Mike forced like made me like make him drive. Like let him drive. While he was driving we went down Chester Street at first. And then we made it to Monroe Street. We made a right on Monroe Street. We |srode down. And while I was in the passenger seat we made a couple of shots. My home boy Taye was in the backseat.
Q: Okay. He—who made a couple of shots?
A: Mike. Mike shot a couple of shots, about two or three shots.
Q: Okay. Did he—where was Mike sitting at?
A: He was in the driver seat.
Q: Oh he was driving at that point?
A: On Monroe Street yes sir.
Q: Okay. And did he drive out of the ... did he shoot out of the sunroof?
A: No not on Monroe Street.
Q: Okay not on Monroe Street. Okay what was the guy name that—do you know the guy that he—that /all were shooting at?
A: No sir.
Q: That Mike shot at?
A: No.
[[Image here]]
Q: (Sgt. Green): Alright. Okay and the next thing y’all went rolled—rolled down by Sixth Street is that correct?
A: Yes sir.
Q: Tell me what happened on Sixth Street?
A: We made it off the highway, off 49 on the exit to Lower Third. We passed up Peabody. Alright we passed up Ed Payne’s store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then... then Mike was like hold on, hold on, hold on before we made it down the street.
Q: Who was driving at that point?
A: I was driving.
Jr • ■ •
A: Yeah and I came to a complete stop about on Solomon.
Q: Right.
A: about on Solomon Street I think, I made a complete stop.
[[Image here]]
A: He jumped out. He walked like up—like in front of the car a lil’ bit. When he turned to the right I noticed he had a gun.
Q: Right
A: Again, well I already knew he had a gun cause he had shot
Q: Right
A: but I noticed when he asked me I noticed he had the gun. So I hurried up and smashed the gas when I made a right on John Thomas I think it is[.]
Q: uh-huh.
*367 A: my home boy Taye was like hurry up and let me drive. You go get us busted, like that. So I let him drive. He made the block and picked Mike up. I was up in the backseat.
Q: Okay back on Sixth Street when Mike got out and he—he fired a couple of rounds when he got out?
A: Yeah. I heard a couple of rounds shot.
[[Image here]]
Q: Alright. Alright. Then Travius wanted to drive?
A: Yeah.
Q: What happened then?
A: Alright uh Mike was driving I was in the backseat. And Taye was up in the passenger seat. Uh we made it past ... what that is ... the ball park Brin-ghurst field and I guess I was like noticed like rode like up it like, cause I was like kind of lazy like laying like-on like the headrest like this.
Q: Right.
hfA: with my hand to my head. And I just noticed Mike upping the gun out the sunroof. That’s what made me like ... really like come to my senses; cause I had been smoking weed. When I seen that I looked, I like tried to look to see who he was aiming the gun at, and I ain’t seen nobody.
Q: Right
A: Then I heard like three shots. Well I seen him shoot like three times you know. He hurried up and smashed off. After that we went to—all went to Mac-Donalds and got something to eat.
Q: Uh-huh.
A: The he was said ... well I asked him what he was fixing to do with the car cause it was almost time for to take it back. He said he got a spot to take it. And he pulled it right on like ... what the name of that street is... um Ninth Street I think it is. Six, seven ... six, seven... six, seven... on Eighth Street on a dead end street and parked it there.
[[Image here]]
Q: Okay y’all just went separate ways from that point?
A: Yes sir.

Texas Avenue Shooting

In his statement, Defendant claimed the Texas Avenue shooting was the third and final shooting, and that he was laying down in the back seat of the ear while Dotson was driving. Quontavius Frazier, aka “Taye,” was in the front passenger seat. He stated Dotson fired three shots then “hurried up and smashed off.” Defendant stated the first shooting was sometime between 8:00 and 9:00 p.m., and there was about three hours between the first shooting and the last. The evidence, however, showed the first shooting occurred on Texas Avenue, not on Monroe Street as suggested by the police when taking Defendant’s statement. The first shooting resulted in the death of Mr. Joe Marzett. The only eyewitness to testify with respect to this shooting, Mr. Jamarques Starling (Starling), testified he In heard the shots between 11:30 and 11:45 p.m. on September 27, 2011, then shortly thereafter saw an “old school” Buick drive past. Noting this was the only car he saw on Texas Avenue for about ten minutes, Starling testified Defendant was not the driver of the car, although he did not get a good look at anyone else in the car. He was also unsure of the color of the car, describing the car at different times as light blue, gray, dark blue, and black. Insistent the car was an “old school” Buick, Starling’s testimony did not connect the Honda Accord Defendant was in on the night in question to the scene of the crime.
*368 Starling testified the shooting occurred between 11:30 and 11:45 p.m. but Defendant said in his statement the first shooting occurred between 8:00 and 9:00 p.m. Special Agent Williams mapped Defendant’s cellphone usage around 11:55 p.m. There was a single text message which occurred at exactly 11:55 and the map notes that the phone was using sectors of the tower[3] that would place the phone northwest of the shooting. Another map of the area shows that prior to 11:50, Defendant’s phone was being used in areas well away from the scene of the shooting, including on the opposite side of Highway 167 between 11:44 and 11:47 p.m., placing Defendant’s phone somewhere between several blocks to a couple of miles away. Williams testified he did not “have any geolocation—a fancy way of saying general location—of the phone between eleven thirty and eleven forty-five.”
Given that Starling could not identify either the Defendant or the car in which he was riding, nor could Special Agent Williams give any information regarding Defendant’s location at the time of the shooting, the only evidence | ^creating any connection between Defendant and the Texas Avenue shooting is Defendant’s admission to police. That admission is contradicted by the other evidence presented. Defendant claimed they sped away from the shooting, while Starling says the vehicle was going slow when it passed him, only going “[f]ive to ten miles per hour.” Defendant’s statement regarding the timing of the shootings places this shooting as the last shooting but all of the evidence presented ' establishes this was the first shooting to occur. The first shooting did not occur on Monroe Street as police suggested to Defendant when taking his “statement.” Given that the only part of Defendant’s admission which is supported by any of the other evidence is the fact that someone actually fired a gun on Texas Avenue. ■

Monroe Street Shooting

Defendant’s statement indicated there were only three people in the vehicle at the time of the Monroe Street shooting: Defendant, Dotson, and Frazier. Defendant also indicated Dotson fired two or three shots and that the shooting was the first shooting which occurred sometime between 8:00 and 9:00 p.m. on September 27, 2011, rather than after midnight on September 28, 2011 as the evidence showed. Daryl White (White) testified he was walking down Monroe Street towards a friend’s house when he saw a car drive past him, turn a corner and stop, and then someone fired about six shots at him. Specifically noting he got a good look at the car while it was stopped under a streetlight, White stated he believed the vehicle was gray, and was certain that the windows were all tinted, except that the tint on the front passenger side was torn, so he was able to see into the car and saw four people in the car. He testified he could not identify them. He also stated that after he was shot in the leg he took off running to his friend’s’ house. He says it took him about five minutes to get there and his friend | ^immediately called 9-1-1. That call came in at 12:24 a.m., which would indicate the shooting was at roughly 12:19 a.m.
Special Agent Williams presented geolo-cation data for Defendant related to the Monroe Street shooting. Based on an approximate shooting time of 12:23 a.m,, Defendant’s phone usage between 12:21 and 12:24 a.m. placed him somewhere within a large area of North Alexandria which also included the location of the shooting at the *369 intersection of Florence Avenue and Monroe Street. Williams, however, provided no evidence as to where Defendant’s phone was located immediately prior to this three-minute window, and could not pinpoint where in the general highlighted area Defendant’s phone was actually located. The area serviced by the tower Defendant’s phone used during, this timeframe covers most of the area between N. MacArthur Drive and Interstate 49 that is north of Jackson Street and extends east past 1-49 to some extent.
State’s Exhibit 13,- a photo of Chris Newell’s vehicle, shows a Honda Accord with no tint on any of the windows, much less any torn tint on the passenger side of the car. Given the discrepancy between Defendant’s description of how many people were in the car and White’s certainty there were four people in the car, as well as the failure of Newell’s vehicle to actually match the detailed description of the car given by White, added to the inaccurate timeframe given for the shooting by Defendant, no rational jury could have found beyond a reasonable doubt the State met its burden of excluding “every reasonable hypothesis of innocence.” Defendant’s conviction and sentence for the attempted second degree murder of Daryl White should be vacated.

Ninth Street Shooting

|uIn his recorded statement to police, Defendant stated he was driving down “Broadway,” and:
We passed up Peabody. Alright we passed up Ed Payne’s store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then .. .then Mike was like hold on, hold on, hold on before we made it down the street.
Defendant’s stated route would have been going north on Broadway Avenue.[4] Payne’s Grocery is on Broadway Avenue between Seventh and Sixth Street. Taking a right onto Sixth Street would have led them down to a fork in the road where Sixth and Seventh Street merge. Solomon Street, where Defendant claims he made a complete stop before Dotson jumped out of the car, dead ends onto Sixth Street immediately before the fork. While this testimony provides a very detailed description of the shooting, there is one major flaw: Peterson was on Ninth Street, not Sixth Street, when the shooting took 'place. Although the State’s brief to this court does nothing to address the fact that the shooting happened on Ninth Street, and both Defendant’s statement and Guillot’s testimony specifically talk about Sixth Street without a single mention of Ninth Street, they argued during their closing that confusing two numbered streets is an easy mistake to make. That, however, ignores the fact that: 1) Defendant actually lived on Sixth Street; 2) his detailed description of their route is completely accurate aside from claiming the shooting was on Sixth Street; and 3) Guillot specifically noted he was familiar with the city of Alexandria, having lived there his entire life.
|1fiAt 12:49 a.m. on September 28, 2011, the RCPD received a call from Marion Peterson (Peterson) reporting someone shot at him on Ninth Street. Peterson told law enforcement at the time of the shoot *370 ing he saw a vehicle swerving in the road, it tried to hit him, then the car stopped, the passenger jumped out, swore at him, and then shot at him twice. He further testified that despite telling two sepai-ate officers on the night of the shooting that the vehicle was a dark blue, four-door Nissan with tinted windows, he is not sure if that description is accurate. He also said he had been drinking at the time. Thus, his testimony is somewhat suspect under State v. Hypolite, 14-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275. Peterson could not say with certainty whether or not Newell’s vehicle was the car from which shots were fired at him. He also stated it took him about ten minutes to compose himself before he called RCPD, thus placing the shooting at roughly 12:40 a.m.
Despite Peterson’s testimony that the shooting took place at about 12:40 a.m., Special Agent Williams’s analysis of Defendant’s cellphone lists an approximate shooting time of 12:52 a.m., and the earliest activity on the map is a text message at 12:45 a.m., roughly five minutes after the actual shooting. Additionally, according to the map produced by Williams for trial, none of the activity charted places Defendant in an area that includes the location where the shooting took place.
Guillot testified that while he was in a holding cell shortly after being arrested at 8:30 p.m. on September 28, 2011, he heard Defendant tell another individual he shot at someone on Sixth Street. This testimony is alleged to have happened in a holding cell during a period of time when Defendant was demonstrably not in the same holding cell, and contains details that do not relate to 11fithe shooting on Ninth Street. None of the evidence presented to the jury actually places Defendant on Ninth Street when some unknown person shot at Peterson. Even when viewed in the light most favorable to the prosecution, no rational jury could have found beyond a reasonable doubt that the State met its burden of excluding “every reasonable hypothesis of innocence.” Defendant’s conviction and sentence for the attempted second degree murder of Marion Peterson should be vacated.

This is a circumstantial evidence case.

With regard to the three shootings, Defendant argues the State’s case against him rested solely on his own admission of being present at the crimes, expert testimony from an FBI Special Agent regarding the general location of his cell-phone around the times of the shootings, and the statement of a witness who claimed to have seen Defendant with a gun after the shootings as well as having overheard Defendant admit to shooting at someone. He argues both of these forms of evidence are circumstantial evidence, and thus, under La.R.S. 15:438, the State must exclude every reasonable hypothesis of innocence in order to obtain a conviction. I believe Defendant is correct in his assertion that the State’s entire case, at least with regard to the three shootings, is built upon circumstantial evidence. I believe the majority errs in applying a standard of review applicable to a case in which there is both direct and circumstantial evidence. Despite the State’s argument before the trial court that Defendant’s statement is direct evidence, under Louisiana jurisprudence the statement was circumstantial evidence. The state supreme court has explained:
Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; whereas circumstantial evidence consists of 117collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience.... Where an essential element of the crime is not *371 proven by direct evidence, La.R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded.
State v. Lilly, 468 So.2d 1154, 1158 (La. 1985) (emphasis added).
There is a difference between a confession, which is direct evidence, and an admission, which is circumstantial evidence. While the State argues Defendant’s statement is direct evidence, the statement is an admission, not a confession. “The term ‘admission’ is applied to those matters of fact which do not involve criminal intent; the term ‘confession’ is applied only to an admission of guilt, not to an acknowledgment of facts merely tending to establish guilt.” State v. Jones, 451 So.2d 35, 40 (La.App. 2 Cir.), writ denied, 456 So.2d 171 (La.1984). Defendant’s statement does not involve criminal intent. Although he admits to being in the car while the shootings were happening, he clearly states that someone else, Michael Dotson (Dotson) was doing the shooting. Defendant was not even aware that Dotson was shooting at people, believing he was simply shooting the gun in the air.
The State then is left with Daniel Guil-lot’s (Guillot) testimony that he allegedly overheard Defendant tell someone else he “busted somebody on Sixth” street. There are two problems with relying on Guillot’s statement: (1) the circumstances under which he claims the statement happened are demonstrably false in the record, and (2) no one was actually shot on Sixth Street. Guillot vehemently testified he was put in the holding tank between 8:30 and 9:00 p.m., and that he overheard Defendant tell another inmate he shot at someone on Sixth 118Street about thirty to forty-five minutes later. Sergeant DiStafano started interviewing Defendant at 8:30 p.m. that day, and Defendant was in an interview room with officers until after he gave his statement, which was recorded at 11:11 p.m. It was physically impossible for the conversation Guillot was adamant happened between 9:00 and 10:00 p.m. in the holding area to have occurred at that time. But, even setting aside the fact that the conversation could not have taken place the way Guillot described it, the statement was at best circumstantial in relation to the three shootings that actually occurred on September 27 and 28, 2011. The alleged statement contained few relevant facts and does not match other known evidence presented at trial. In Jones, the second circuit found that a defendant’s statement he shot someone with a gun which he threw into the river was an admission, as it did not involve intent nor did it state “the victim’s name, the purpose of the shooting, where the shooting occurred, or any other event relating to the shooting.” 451 So.2d at 40. Similarly, the statement Guillot claims to have overheard does not involve intent, and while Guillot testified that it did include the location of the shooting, the location is not a location where an actual shooting took place. Additionally, even if this court accepted the State’s claims that Defendant simply confused Sixth Street and Ninth Street, the statement still would not be direct evidence with respect to the Texas Avenue or Monroe Street shootings.

Error injury instructions.

In his argument to this court regarding sufficiency of the evidence, Defendant asserted the case was based purely on circumstantial evidence and the jury should therefore have been informed that under La.R.S. 15:438, the State was required to “exclude every reasonable hypothesis of innocence.” Additionally, he |1flnoted Defense counsel at trial twice requested that the jury be informed of this requirement. As noted previously, the trial court incorrectly denied that request on the grounds *372 that Defendant’s admission and Guillot’s testimony amounted to direct evidence. Although this error was not raised as an assignment of error, “Louisiana courts have recognized cei’tain rights are so basic and ‘due process’ requirements mandate that they may be asserted for the first time on appeal or noticed as an error patent by mere inspection of the pleadings and proceedings.” State v. Pyke, 93-1506, p. 3 (La.App. 3 Cir. 5/4/94), 640 So.2d 460, 462. Accordingly, this court may review this error of law despite it not being set out as an assigned error.
In State v. Porter, 626 So.2d 476 (La. App. 3 Cir. 1993), this court reversed a conviction for attempted second degree murder due to an erroneous jury instruction, noting that the issue was a due process violation that should be dealt with on appeal, despite trial counsel’s failure to object, rather than later post-conviction relief “in the interest of fundamental fairness and judicial economy.” 626 So.2d at 479. The trial court deprived Defendant of his right to due process by denying Defendant’s request to instruct the jury that where the State’s entire case is based on circumstantial evidence, the evidence “must exclude every reasonable hypothesis of innocence,”. See La.R.S. 15:438. The state supreme court has repeatedly held jury instructions must be considered as a whole. Nothing in the jury charge here would inform the jury of the State’s burden on circumstantial evidence. The trial court did not mention direct evidence in its jury instructions, and gave the following instruction on circumstantial evidence[5]:
Ian• • • circumstantial evidence is [sic] facts or circumstances from which one might infer or conclude according to reason and common experience the existence of other connected facts. Further, circumstantial evidence is that where the main fact can be inferred when using reason and common sense from proof of collateral facts and circumstances. Circumstantial evidence further involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning or inference by which a conclusion was drawn. The gist of circumstantial evidence and the key to it is the inference or process of reason by which the conclusion is reached. This must be based on the evidence given together with the sufficient background of human experience to justify the conclusion.
Not only was the jury not informed that the State’s circumstantial evidence “must exclude every reasonable hypothesis of innocence,” they were not informed of the definition of direct evidence, or of the distinction between the two. See La.R.S. 15:438. Accordingly, Defendant’s convictions with respect to the shootings should be reversed due to improper jury instruction. Under the holding in Porter, these charges should be remanded to the trial court for a new trial, as the reversal would be based not on evidentiary insufficiency but rather trial court error. 626 So.2d at 479.

Possession of a firearm by a convicted felon.

I agree with the majority’s finding that Defendant’s conviction for possession of a *373 firearm by a convicted felon, in violation of La.R.S. 14:95.1, and his sentence therefor, should stand. In order to convict Defendant, the State needed only to prove Defendant was a convicted felon and he in fact possessed a firearm. See State v. Mose, 412 So.2d 584 (La.1982). During trial, Defendant and |g1the State entered a joint stipulation that Defendant had a pri- or felony conviction for Possession of CDS II. Additionally, Guillot testified he saw Defendant around 1:30 a.m. on September 28, 2011, with a silver and black gun in his waistband. Unlike Guillot’s testimony regarding the other offenses, his testimony regarding the gun is not contradicted by concrete physical facts. Viewing this evidence in the light most favorable to the prosecution, a rational jury could have found Defendant guilty beyond a reasonable doubt as to this offense.
For these reasons set forth in extenso I respectfully dissent from the majority’s af-firmance of Defendant’s conviction for the three shootings. The convictions based on the three shootings should be reversed and the case remanded for a new trial.

. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

. McNabb v. United States, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and Mallory v. United States, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) held that an arrested person's confession is inadmissible when given after unreasonable delay to bring him before a judge.

. Special Agent Williams testified that each cell tower has three different sectors, each with a specific ID, and that each sector covers areas in different directions from the tower.

. Defendant’s described route can be traced on Google Maps and the validity of that information can be accomplished using the City of Alexandria’s website at parks andrec.cityofale-xandriala.com. Although there are multiple maps included as exhibits, they lack relevant street names. State’s Exhibit 27 was an enlarged map which may have included the street names, however, that exhibit was not submitted with the record. Accordingly, Google Maps was used to verify the street names for the streets shown on the included exhibits.

. It is not clear from the record what the source of this instruction is. It does not address the distinction between direct and circumstantial evidence. The suggested jury instruction for “Direct and circumstantial evidence” in the Louisiana Civil Law Treatise is simply:
Evidence is either direct or circumstantial. Direct evidence is evidence which, if believed, proves a fact. Circumstantial or indirect evidence is evidence which, if believed, proves a fact and from that fact you may logically and reasonably conclude that another fact exists.
You cannot find a defendant guilty solely on circumstantial evidence unless the facts proven by the evidence exclude every reasonable hypothesis of innocence.